In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 05-4145 & 05-4150

EDWARD ADAMS, PEGGY ADAMS,
HELEN ADAMS, et al.,

*Plaintiffs-Appellants,*

*v.*

CITY OF CHICAGO,

*Defendant-Appellee.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 94 C 5727 & 00 C 3192—**John A. Nordberg**, *Judge.*

———————

ARGUED JUNE 1, 2006 —DECIDED NOVEMBER 16, 2006

———————

Before FLAUM, *Chief Judge*, and MANION and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* Minority Chicago police officers sued the City of Chicago, claiming that a 1994 examination for promotion to sergeant, and the ensuing February 1997 promotions based on that examination, had a disparate impact that discriminated based on race. The district court granted summary judgment to Chicago, determining that the police officers could not demonstrate the availability of an alternative method of promotion that was equally valid

and less discriminatory than the examination used. We affirm.

## I.

Chicago employs approximately 10,000 sworn law enforcement officials, including 8,000 police officers and 1,200 sergeants. Sergeants supervise the officers, and lieutenants, in turn, supervise the sergeants. Chicago's methods for promoting officers up these ranks has proven to be a contentious issue that has spawned litigation over the past several decades.[1]

Responding to the continuing controversy over promotions, Chicago's mayor appointed a panel in 1990 to make recommendations concerning future promotions. Based

---

[1] *See, e.g.*, *Banos v. City of Chicago*, 398 F.3d 889, 890 (7th Cir. 2005) (minority sergeants challenged 1998 promotions to lieutenant); *Allen v. City of Chicago*, 351 F.3d 306, 307 (7th Cir. 2003) (minority officers challenged 1998 promotions to sergeant); *Barnhill v. City of Chicago*, 142 F. Supp. 2d 948, 950 (N.D. Ill. 2001) (white male officers challenged 1998 promotions to sergeant); *Bryant v. City of Chicago*, 200 F.3d 1092, 1094 (7th Cir. 2000) (minority sergeants challenged 1994 promotions to lieutenant); *Deveraux v. City of Chicago*, 14 F.3d 328, 331 (7th Cir. 1994) (sergeants and lieutenants challenged Chicago's retiring of previous promotional roster); *United States v. City of Chicago*, 870 F.2d 1256, 1257-58 (7th Cir. 1989) (white female sergeants challenged 1988 promotions to lieutenant); *Bigby v. City of Chicago*, 766 F.2d 1053, 1055 (7th Cir. 1985) (minority and white sergeants challenged 1977 promotional exam for lieutenant promotions); *United States v. City of Chicago*, 411 F. Supp. 218, 224 (N.D. Ill. 1976) (minorities and women challenged the 1971 exam for promotion to sergeant), *aff'd in part*, 549 F.2d 415 (7th Cir. 1977).

on those recommendations, Chicago hired an outside consultant to create a promotional examination. In the present suit, black and Hispanic officers challenge the resulting 1994 examination used to promote officers to sergeants and the promotions made based on the examination scores. The promotional examination consisted of three parts, which we described in a previous opinion:

> Part I contained multiple-choice questions covering the law, department procedures, and other regulations sergeants needed to know. Part II (also multiple-choice) tested the administrative functions performed by sergeants, including reviewing reports and determining crime patterns. Candidates who did well on Parts I and II were presumed to know the fundamentals and were then given the opportunity to take the third part of the test, an oral examination based on a written briefing.

*Adams v. City of Chicago*, 135 F.3d 1150, 1152 (7th Cir. 1998). Each of the three parts was weighted equally and the scores ranked. The ranking generated a promotional list, with the highest score listed first and entitled to the first promotion. The parties agree that this examination and ranking had a disparate impact on minorities. Chicago made promotions to sergeant based on this ranking in August 1994, March 1996, and, relevant here, on February 22, 1997, before retiring the promotional list. Earlier in these proceedings, the officers sought an injunction to prohibit Chicago from making further sergeant promotions, which the district court denied and we affirmed. *Id.*

As the litigation continued, the mayor appointed a task force to make recommendations for the promotional process. The task force issued its report on January 16, 1997, which included a recommendation that, in the future, thirty percent of promotions to sergeant be based upon merit, with

the promotional tests used to assure "a minimum level of competence." *Adams*, 135 F.3d at 1153. Merit refers to the officers' on-the-job performance, as rated by their supervisors. Merit does not necessarily correlate with performance on the examination. Chicago did not follow this recommendation in making its February 22, 1997 promotions just over one month later.

Chicago administered its first written examination for police officers over a century ago in 1894. It did not make promotions from officer to sergeant based on merit until after the task force's recommendations in 1998. Nonetheless, the officers submit that Chicago could have and should have instituted a merit component for promoting officers to sergeants. The officers point out that, beginning in 1989, the City used merit to fill twenty percent of D-2 positions. D-2 positions retain the rank of police officers, but function as detectives, youth officers, and gang crimes specialists. Furthermore, the officers note that pursuant to the task force's recommendations, Chicago made thirty percent of its promotions from officer to sergeant and from sergeant to lieutenant based on merit beginning in 1998. Since Chicago considered merit in appointing D-2 positions and lieutenants, and since the panel recommended merit considerations for prospective sergeant promotions, the officers argue that Chicago could have used merit in making thirty percent of the promotions to sergeants in 1997. They claim that this consideration would have been an equally valid, less discriminatory method of promotion and that Chicago's failure to consider merit therefore violated Title VII.

Faced with these claims in a well-trodden field of litigation, the district court excluded evidence of Chicago's promotional process for promotions made after 1997, reasoning that the evidence was irrelevant and inadmissible

as a subsequent remedial measure. Without this evidence, the district court then determined that the officers could not demonstrate that considering merit was a method that was available to Chicago in 1994 or that the consideration of merit would result in equally valid, less discriminatory promotions. Accordingly, the district court granted summary judgment to Chicago. The officers appeal.

## II.

We review de novo the district court's grant of Chicago's motion for summary judgment, viewing the facts and drawing inferences in the light most favorable to the police officers, who are the non-moving parties. *Allen*, 351 F.3d at 311. At the outset, we address the district court's exclusion of evidence of the 1998 promotions, which provided that thirty percent of the promotions be based on merit. Since "decisions regarding the admission and exclusion of evidence are peculiarly within the competence of the district court," we review the district court's "rulings on motions in limine for an abuse of discretion." *Heft v. Moore*, 351 F.3d 278, 283-84 (7th Cir. 2003) (internal quotation and citation omitted). As noted, the district court reasoned that the later promotions to a different rank were irrelevant to determining the available methods for sergeant promotions in 1994, and also analogized the changes in promotional methods to subsequent remedial measures that should be excluded under Federal Rule of Evidence 407. The officers contest these rulings on appeal.

Rule 407 provides that "[w]hen, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures

is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction." We have previously noted that "[t]he purpose of Rule 407 is to promote safety by removing the disincentive to take post-accident safety measures that would exist if the accident victim could introduce evidence of these measures on the issue of the defendant's liability." *Probus v. K-Mart Inc.*, 794 F.2d 1207, 1210 (7th Cir. 1986) (citing *Pub. Serv. Co. v. Bath Iron Works Corp.*, 773 F.2d 783, 791 (7th Cir. 1985); *Flaminio v. Honda Motor Co.*, 733 F.2d 463, 469 (7th Cir. 1984)). The plain language of this rule does not readily apply to disparate impact claims, which are not naturally described as "an injury or harm allegedly caused by an event." Even if we were to apply Rule 407, our analysis of this disparate impact claim requires us to address the availability of an alternative promotional method, as will be discussed below. A subsequently enacted method bears on the availability of the alternative method at an earlier time. Because we must discuss the availability of an alternative method, this situation falls within the ambit of the exception contained in Rule 407, which explicitly "does not require the exclusion of evidence of subsequent remedial measures when offered for another purpose, such as proving . . . feasibility of precautionary measures." Since another purpose is at issue here, Rule 407 is an improper basis for the exclusion of the 1998 promotional method.

The district court also excluded this evidence based on relevancy, concluding that "evidence of [the City's] promotion practices well after the promotions at issue is irrelevant to the issue of what information/alternatives were available when the disputed promotions were made." In addressing hiring practices, the Sixth Circuit has explained that "in proving the existence of a viable alternative hiring proce-

dure, the court should consider evidence that the plaintiff might introduce on a variety of factors. Certainly any subsequent practices adopted by the company would be relevant." *Chrisner v. Complete Auto Trans., Inc.*, 645 F.2d 1251, 1263 (6th Cir. 1981). We agree that evidence of subsequent procedures may be relevant to proving the availability of a procedure at an earlier time. Consequently, the district court abused its discretion in excluding this evidence. Even considering this evidence, however, the officers fail to show that Chicago had an opportunity to adopt an alternative available method for evaluating the merit of officers seeking promotion to sergeants before the promotions were made in 1997.

As we have previously held, in order "[t]o succeed on a disparate impact claim, plaintiffs bear the burden of showing that a particular employment practice causes a disparate impact on the basis of race." *Allen*, 351 F.3d at 311. Chicago concedes that the 1994 promotional examination, the employment practice at issue, had a disparate impact on minority officers. Having established the disparate impact, "the burden shifts to the City to demonstrate that the promotion process is 'job related' and 'consistent with business necessity.' " *Banos*, 398 F.3d at 892 (citing 42 U.S.C. § 2000e-2(k)(1)(A); *Allen*, 351 F.3d at 311). The officers concede that the examination was job related and consistent with business necessity in the wake of *Bryant*, 200 F.3d at 1094, which validated a similarly constructed examination for promotions from sergeant to lieutenant. Thus, "the burden shifts back to the plaintiff to prove that there was another available method of evaluation which was equally valid and less discriminatory that the employer refused to use." *Bryant*, 200 F.3d at 1094 (citing 42 U.S.C. § 2000e-2(k)(1)(A)(ii); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975)).

We therefore consider whether the officers meet this burden. The officers propose as an alternative that Chicago could have made thirty percent of the 1997 promotions based on merit. To succeed with this claim, this alternative "must be available, equally valid and less discriminatory." *Allen*, 351 F.3d at 312 (citing *Bryant*, 200 F.3d at 1094). Thus, to prevail, the officers must show that making the thirty percent of the promotions to sergeant based on merit "would be of substantially equal validity" as promotions based solely on the 1994 sergeant examination, and that including such merit promotions "would be less discriminatory than" use of the examination alone. *Id.* In other words, "the officers effectively bear the burden of establishing that the last officer promoted [in the proposed] merit-based selection process would be roughly as qualified as the officer with the [ ] lowest score on the" 1994 examination who was slated to be promoted. *Id.* (citing *Albemarle*, 422 U.S. at 425; *Bryant*, 200 F.3d at 1094). Most critical to this case, "the statutory scheme requires plaintiffs to demonstrate a viable alternative and give the employer an opportunity to adopt it." *Id.* at 313 (citing 42 U.S.C. § 2000e-2(k)(1)(A)). Disparate impact, then, requires the officers to demonstrate that Chicago "refuse[d] to adopt such alternative employment practice." 42 U.S.C. § 2000e-2(k)(1)(A)(ii).

In subsequent litigation related to the 1998 promotional examination, Chicago agreed "that merit-based promotions at the thirty percent level are of substantial equal validity as assessment-based promotions." *Allen*, 351 F.3d at 313 (citations omitted). Even if we were to apply this concession in this case, the officers have not shown that a process for evaluating officers on their merit for promotions to sergeant was available in 1997 or that Chicago refused to

adopt this alternative earlier.[2] Without an available method for Chicago to adopt, the officers' claims fail. We will explain.

No procedure for evaluating the merit of potential sergeants existed at the time of the contested 1997 promotions.[3] In fact, when the consultant created the 1994 examination, on which the 1997 promotions were based, Chicago had never considered merit for promotions to sergeant in the 100 years after written exams were instituted for the police officers. The parties also agreed that as of February 22, 1997, the date of the contested promotions, "the City had never developed, and had never had developed for it, a mechanism or procedure for merit promotions to the rank of police sergeant that had ever been validated." The lack of a validated procedure is significant, since, as the expert who created the examination testified, it is difficult to obtain

---

[2] We agree with Judge Williams' statement that "[a] reasonable alternative is not unavailable simply because the defendant has not completed its own inquiry into the viability of the alternative." (Williams, J., dissenting *post* at 16.) As the remainder of this opinion explains, however, after a thorough search, we find the record to be devoid of evidence that the City could have feasibly developed and applied a valid merit selection method for promotions to sergeant during the month between the recommendation of merit selection and the promotions at issue. This remains plaintiffs' burden to demonstrate.

[3] The vice chairman of the mayor's 1990 panel testified that, before the creation of the 1994 examination at issue, the minority police officer organizations expressed "a great distrust of any subjective components of test processes, including any reliance on performance evaluations." In accordance with this submission, the panel recommended the creation of an examination by outside consultants over a defined set of materials, without merit consideration.

objective, reliable merit ratings from supervisors in a litigious climate where "they may be accused of favoritism, bias, perhaps even discrimination" based on the ratings.

The subsequent January 16, 1997, task force report did recommend the use of merit in future promotions to sergeant, perhaps in part due to the undisputed disparate impact of the 1994 examination. This recommendation, however, was prospective, noting that "the criteria for merit promotions should be developed by the Superintendent and broadly distributed." After receiving the recommendation, Chicago hired another expert to develop a new promotional examination and an appropriate merit selection procedure. The expert spent months performing a job analysis of the sergeant position and developed criteria for merit selection based on an analysis of the skills necessary to the position. The resulting merit selection process involved the training of select nominators, who were then held accountable for the accuracy of their nominations, and the further review of the nominees by the Academic Selection Board and the Superintendent of the Chicago Police Department. *Allen*, 351 F.3d at 309-10. This process, from recommendation through implementation, spanned about nineteen months. Merit was then used in making the August 1998 sergeant promotions. To demonstrate that merit should have been used in the 1997 sergeant promotions, the officers bear the burden of demonstrating that a valid merit selection process was available on February 22, 1997, only one month after the task force recommended considering merit and before the development of appropriate criteria and process, and that Chicago refused to adopt it. 42 U.S.C. § 2000e-2(k)(1)(A)(ii).

To meet this burden, the officers submit that merit evaluations could have been implemented sooner, since

merit was already used in selecting the D-2 positions. The task force did suggest in January 1997 using "the existing merit selection process for detectives as a model" for sergeant promotions. Nothing in the record, however, indicates that the D-2 process could be adopted in toto for sergeants. Both the D-2 and sergeant positions were filled by police officers. Unlike the D-2 positions, however, the sergeant positions were supervisory. Thus, the merit selection process needed to discern and evaluate supervisory attributes in the non-supervisory rank of officers. Although the D-2 merit promotion process existed in 1997, it does not follow that Chicago had an available, equally valid method for promoting officers to sergeants at that time based on the D-2 procedure. There was no method for promoting sergeants that Chicago "refuse[d] to adopt" and apply in 1997. 42 U.S.C. § 2000e-2(k)(1)(A)(ii).

The officers next point to certain promotions from sergeant to lieutenant, which incorporated merit in 1995. Again, the merit promotion process for lieutenants does not demonstrate that a process would be available for sergeants or that Chicago refused to adopt an available alternative method. First of all, unlike evaluating non-supervisory officers for a promotion to a supervisory position, both the sergeant and lieutenant positions are supervisory. Thus, evaluations of sergeants' performance already encompassed the supervisory aspects. The officers have not shown the availability of a merit evaluation process of officers that would evaluate attributes for the sergeant position. Furthermore, the pool of sergeants seeking promotion to lieutenant is significantly smaller than the pool of officers seeking promotion to sergeant. For example, in 1994, 765 sergeants sought promotion to lieutenant, while 4,700 officers sought promotion to sergeant. The officers have not shown that a valid evaluation method was available on this large scale.

*See Allen*, 351 F.3d at 313-14 (addressing limitations in merit evaluation when number of candidates for promotion increase). Furthermore, the 1995 promotions to lieutenant were, unsurprisingly, challenged in federal court. *Brown v. City of Chicago*, 19 F. Supp. 2d 890 (N.D. Ill. 1998). In that case, the district court noted that the "criteria and procedures put in place" for making the 1995 merit promotions (which were based on past job performance) "were abbreviated and, as the parties agree, inferior" to the merit evaluations subsequently used in 1998. *Id.* at 892. The plaintiffs here do not present evidence that evaluation of officers' past performance or an alternative evaluation method was available or sufficient for ascertaining the merit of potential sergeants, let alone demonstrate that such an inferior method would be equally valid to the rankings from the 1994 examination alone.[4] Thus, the officers have not demonstrated that Chicago refused to adopt an available

---

[4] Judge Williams emphasizes in her dissent the eight-day period during which the City implemented merit promotions from sergeant to lieutenant (between February 28, 1995 and March 8, 1995). (Williams, J., dissenting, *post* at 16.) We note that the lieutenant merit promotions were almost immediately enjoined by the Illinois courts for violating state law. *See McArdle v. Rodriguez*, 659 N.E.2d 1356, 1359 (Ill. App. 1995). The injunction was invalidated by federal litigation, but notably not until July 6, 1998, more than 16 months after the promotions to sergeant at issue in this case. *See Brown v. City of Chicago*, 8 F. Supp. 2d 1095, 1111-12 (N.D. Ill. 1998). Of course, a state court injunction is no excuse for violating federal law, but it does indicate that the City did not "refuse[ ] to adopt" an available alternative. 42 U.S.C. §2000e-2(k)(1)(A)(ii). Regardless, the size and scale of the applicant pool and the officers' lack of supervisory experience distinguish the available methods used for promotions to sergeant from the promotions to lieutenant.

method for considering merit in making sergeant promo-tions in 1997. 42 U.S.C. § 2000e-2(k)(1)(A)(ii).

In sum, while the officers assert that thirty percent of the promotions to sergeant should be made based on merit, a proposition subsequently adopted by Chicago, the officers have not demonstrated that this method was available in February 1997 or that Chicago refused to adopt an alter-native method. As we explained above, "the statutory scheme requires plaintiffs to demonstrate a viable alter-native and give the employer an opportunity to adopt it." *Allen*, 351 F.3d at 313 (citing 42 U.S.C. § 2000e-2(k)(1)(A)). Simply stated, the plaintiffs have failed to demonstrate that Chicago had an opportunity to adopt and implement the thirty percent merit-based promotional method in a valid, viable manner on or before February 22, 1997. The task force on the issue made its recommendations for merit promotions just about one month before, on January 16, 1997. At the time of the contested sergeant promotions, no process existed for evaluating the merits of officers for promotion to sergeant. Although, in theory, Chicago could have chosen to base thirty percent of the promotions to sergeant on merit, there is no evidence that by 1997 Chicago had developed criteria or a method for examin-ing the merit of officers for promotion to sergeant. Thus, the officers failed to demonstrate the availability of an allegedly viable alternative that Chicago refused to adopt. Further-more, the officers have not shown that a hastily adopted merit evaluation process would have been of substantially equal validity to the rankings resulting from the 1994 examination.

III.

The officers have not demonstrated that Chicago had an alternative method available to evaluate the merit of potential sergeants, or refused to adopt such a method, by February 22, 1997, the date of the contested promotions. Therefore, their disparate impact claim fails. Accordingly, we AFFIRM the judgment of the district court.

WILLIAMS, *Circuit Judge*, dissenting. The majority concludes that the plaintiffs failed to demonstrate the existence of a question of material fact because they did not produce evidence that a substantially equally valid alternative was available to the City in 1997, at the time of the contested promotions. But as the majority opinion discusses, the district court abused its discretion in excluding evidence of the City's subsequent success with merit promotions at the sergeant level. *See Chrisner v. Complete Auto Transit, Inc.*, 645 F.2d 1251, 1263 (6th Cir. 1981) ("Certainly any subsequent practices adopted by the company would be relevant" to determination of whether plaintiff could show existence of "an alternative selection device with a disparate impact less than that of the challenged practice."). With this evidence considered, the question of validity is answered. The only question is whether 30% merit promotions were "available" in February of 1997.

The majority opinion seems to conclude that the plaintiffs have not met their burden of demonstrating availability because the plaintiffs never presented the City with a proposal validated under the methods that were ultimately employed by the city. Nothing in the statute, the applicable

regulations, or in our caselaw, however, indicates that, under 42 U.S.C. § 2000e-2(k)(1)(A)(ii), for an alternative to be available it must have been validated in this manner. At bottom, the relevant question is simply whether there is evidence in the record from which a reasonable jury could conclude that at the time of the contested promotions, the City could have used the 30% merit promotions proposal. The answer to this question is "yes." Regardless of whether the process of formulating a promotional process for sergeants was more complex than that for either D-2 or lieutenant promotions, the fact that the City had successfully implemented essentially the same system for these ranks is powerful evidence that the alternative was available for sergeant promotions and the City refused to adopt it.

At the very least, a question of material fact remains as to whether the pace and nature of the City's investigation into the possibility of using 30% merit promotions for sergeants was reasonable. This is underscored by the timeline of this case—as the majority opinion describes, the City's Task Force recommended the use of the 30% merit promotions proposal more than one month before the promotions in question. In contrast, it took the City only eight days to move from the Task Force's recommendation to implementation when the City examined its system for promoting lieutenants. There is a logical disconnect between the idea that the City's own task force had recommended use of this system and the majority's conclusion that this alternative was unavailable more than one month later. The explanation for this disconnect is that the majority has unnecessarily complicated the question of availability. An alternative is unavailable when, for verifiable reasons, the defendant cannot adopt it. A reasonable alternative is not unavailable simply because the defendant has not completed its own inquiry into the viability of the

alternative.

A true situation of no viable alternative being available can be found in the Eleventh Circuit's decision in *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112 (11th Cir. 1993). In *Fitzpatrick*, black firefighters challenged an Atlanta Fire Department rule that required them to be clean shaven because of the racially discriminatory impact of this rule. *See id.* at 1114 ("The twelve plaintiff-appellant firefighters in this case are all African-American men who suffer from pseudofolliculitis barbae ('PFB'), a bacterial disorder which causes men's faces to become infected if they shave them. It is generally recognized that PFB disproportionately afflicts African-American men."). The firefighters proposed that "shadow beards" would constitute a less-discriminatory alternative with equal safety value, but the Eleventh Circuit concluded that the firefighter plaintiffs had failed to introduce sufficient evidence to raise an issue of material fact where the City had submitted voluminous evidence of the safety-necessity of its no-beard policy. *See id.* at 1122-23. This case is not like *Fitzpatrick*, where a less-discriminatory alternative *literally* did not exist for scientifically verifiable reasons. Similarly, the Second Circuit has observed that in housing disparate impact cases, the question of whether a proposed alternative is available should be determined by objective factors such as cost. *See Hack v. President and Fellows of Yale College*, 237 F.3d 81, 101 (2d Cir. 2000) ("Factors such as the cost or other burdens of the proposed policy are relevant to a determination as to whether the defendant's refusal to adopt an alternative housing procedure was reasonable."), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

An alternative was available here. There is a question of material fact as to whether the City took proper steps

in assessing its viability and in promptly implementing it. While the City's timing may have been perfectly reasonable in this case, this was a question for trial. By deferring to the defendant's calculation of the time needed to implement an equally valid alternative, our decision invites abuse by defendants acting in bad faith. I therefore respectfully dissent from the majority's affirmance of the grant of summary judgment.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*